[Cite as *In re S.P.*, 2011-Ohio-5633.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: S.P.

C.A. Nos.    25989
                25991


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN 09-07-582

DECISION AND JOURNAL ENTRY

Dated: November 2, 2011

WHITMORE, Judge.

{¶1}    Appellant, Sakinah B. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her child, S.P., and placed her in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I

{¶2}    Mother and Gregory P. ("Father") are the parents of S.P., born September 18, 2001. At the time these proceedings began, S.P. was in the custody of Mother. Father did not participate in the permanent custody hearing below and is not a party to this appeal.

{¶3}    The events that prompted this case took place on the evening of July 16, 2009, when Mother and S.P. disembarked from a bus at a downtown Akron bus station and Mother was afraid to walk home because she was seeing shadows. Mother called the police, who responded to the scene. According to the complaint, Mother told the police that she wanted to hurt herself

or others, her neighbors were stalking her, and her apartment was "bugged." The police took Mother to a hospital for evaluation. Because Mother did not provide them with the names of any relative caregivers, the police assumed custody of the child pursuant to Juv.R. 6 and contacted CSB. On the next day, the agency filed a complaint in juvenile court alleging dependency.

{¶4} Mother was soon released from the hospital with a prescription for medication and advice to seek counseling. She testified at the shelter care hearing and admitted contacting the police to investigate harassment by her neighbors, but denied making statements that she was afraid of shadows or that she was going to hurt herself or others. She said that she had previously been prescribed medication by her family doctor, but stopped taking it because it made her sick. The trial court continued S.P. in emergency temporary custody and scheduled adjudicatory and dispositional hearings. In the interim, the agency filed an amended complaint to include an allegation of neglect based on school attendance issues.

{¶5} Mother attended the adjudicatory hearing, but did not attend the dispositional hearing. Father attended neither hearing. Efforts to serve Father at his last known address were unsuccessful, and service was eventually obtained by posting. Following these hearings, S.P. was adjudicated neglected and dependent under R.C. 2151.04(C) and was placed in the temporary custody of the agency.

{¶6} The trial court adopted the proposed case plan which focused on Mother's mental health issues, requiring a psychological/psychiatric evaluation and compliance with all treatment recommendations. The case plan also required that the basic needs of S.P. should be met. Those needs included proper nourishment, clean clothing, safe shelter, positive attention, medical needs, and regular school attendance. According to the case plan, Mother was offered a

minimum of one hour of visitation with S.P. per week. Father was also offered visitation, but did not engage in any visits. In due course, CSB moved for permanent custody.

{¶7} On February 16, 2011, Mother's attorney sought a competency evaluation of Mother and a continuance of the previously scheduled permanent custody hearing. As basis, Mother's attorney explained that the caseworker and caregiver questioned whether Mother understood the nature of the proceedings against her and whether she was able to adequately assist in her defense. The trial judge ordered a competency evaluation of Mother and continued the permanent custody hearing. The evaluation indicated that Mother was able to assist in her defense, but because the assessment was predicated on Mother continuing to comply with her medications and it could not be assumed that Mother would be compliant at the time of the hearing, the trial court appointed a guardian ad litem for Mother.

{¶8} The matter was heard on May 16, 2011, although neither parent was present. Mother was represented by counsel, who stated that he did not know Mother's whereabouts and had had no contact with Mother since the last hearing. Father was served at the Belmont Correctional Institution, but he neither requested counsel nor did he request to be present at the hearing. At the conclusion of the hearing, the trial court granted CSB's motion for permanent custody. The trial court found that S.P. had been in the temporary custody of CSB for more than 12-of-22 consecutive months, the child could not or should not be placed with either parent within a reasonable time, and Father had abandoned S.P. The court also found that it was in the best interest of the child to be placed in the permanent custody of the agency. Mother has appealed and assigns one error for review.

## II

### Assignment of Error

"THE TRIAL COURT'S DECISION GRANTING PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶9}    In her sole assignment of error, Mother contends that the trial court erroneously concluded that the weight of the evidence supported an award of permanent custody. More specifically, she argues that the court erred in finding that permanent custody was in the best interest of the child.

{¶10} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, paragraph three of the syllabus.

{¶11} The trial court found that the first prong of the permanent custody test was satisfied because S.P. had been in the temporary custody of CSB for at least 12 of the prior 22 months. Additionally, the trial court found that Father abandoned S.P., Father demonstrated a lack of commitment to her, and Mother failed to remedy the conditions that led to removal of the

child. For these reasons, the trial court also found that S.P. cannot or should not be placed with either parent within a reasonable time. Mother does not contest the trial court finding on the first prong of the permanent custody test, but rather challenges the finding that permanent custody is in the best interest of the child.

{¶12} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D)(1): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in her life. See *In re R.G.*, 9th Dist. Nos. 24834 & 24850, 2009-Ohio-6284, at ¶11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith* (Jan. 2, 2002), 9th Dist. No. 20711, at *3. See, also, *In re Palladino*, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶24.

{¶13} The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the child. By all accounts, Mother and S.P. love each other and show affection to one another, but Mother's mental health issues have not been resolved and have interposed many problems in Mother's ability to maintain a healthy relationship with her daughter and to provide a stable home for her.

{¶14} When this case began, Mother was taken to a hospital for evaluation. Based largely on self report, she was prescribed medication, advised to obtain counseling, and released. Once CSB became involved, the CSB caseworker, Danielle Edgar, provided Mother with a list of mental health providers. Ms. Edgar testified that Mother did not follow up with any of the providers until she was hospitalized again in October 2009. Upon her release from the hospital,

she was put on "outpatient commitment" and was referred to Community Support Services for mental health services.

{¶15} Mother was evaluated by Dr. Tamini Elahi, a staff psychiatrist at Community Support Services, and was diagnosed with a psychotic disorder NOS and rule out schizophrenia, paranoid type. Ruling out schizophrenia was a process that could take up to six months. Dr. Elahi testified that Mother was symptomatic, but not to the point of needing to be hospitalized. She stated that Mother admitted that she had been non-compliant with her medications in the past because she did not like the side effects and did not believe she needed medication anyway.

{¶16} Dr. Elahi explained that the treatment for either a psychotic disorder or schizophrenia typically includes medication to control the symptoms and counseling. In Mother's case, her symptoms included delusions and paranoid beliefs that her neighbors were putting something in her house vents and practicing voodoo. Dr. Elahi prescribed a better-tolerated medication and recommended monthly follow-up visits with an agency case manager and/or staff psychiatrist to monitor her medication and to assist in completing the diagnosis in terms of possibly ruling out schizophrenia. According to Dr. Elahi, if a patient with such a diagnosis takes his or her medication regularly, the symptoms will typically improve. If, however, the patient does not take the prescribed medication or remains symptomatic, the patient's condition may interfere with his or her ability to make life decisions for themselves as well as others who may be in the patient's care. In Mother's case, she often let her prescription run out, did not return for appointments, and did not return phone calls.

{¶17} Stacy Coffman was Mother's first case manager from Community Support Services. Ms. Coffman explained that her role was to help Mother adhere to her treatment plan, which included addressing her psychosis, helping her stay on track with CSB, and assisting in

managing her medication. Mother was expected to keep monthly appointments at Community Support Services. Because Mother failed to keep so many of her appointments and did not return phone calls, Ms. Coffman made efforts to seek Mother out and took her medication to her home several times. Mother admitted throwing away her medication on at least one occasion because she did not like the taste. Ms. Coffman was concerned that Mother missed so many appointments – with her as well as with the treating psychiatrist – and that she appeared to be delusional.

**{¶18}** The CSB caseworker, Ms. Edgar, testified that, after April 2010, Mother did not follow up with any services at Community Support Services nor with any other mental health treatment program, despite the fact that she talked with her at least monthly about the importance of following up with treatment and medication. The caseworker also explained that in August of 2010, Mother was arrested when police arrived to find broken glass outside a neighbor's house and egg running down the door. Mother was taken to the hospital and subsequently pled guilty to several misdemeanors. She was incarcerated from October 2010 until February 2011, when she was released to a pre-release program at Oriana House. Mother left Oriana House with the claim that she had appropriate housing with her sister. Shortly thereafter, she was reported to be living with a boyfriend. Mother's previously held public housing was lost when she was incarcerated. Ms. Edgar stated that she understood from Mother that she intended to seek the custody of her daughter at the permanent custody hearing.

**{¶19}** Ms. Edgar testified that Mother's attendance at visits with her daughter was fairly regular at first, but became sporadic. S.P. was usually happy to see Mother at visits, but very sad when Mother did not show up. Because Mother's "no-shows" were so upsetting to S.P., Mother was eventually asked to confirm her visits in advance. Mother's last two visits with S.P. were in

December 2010 and February 2011, while she was incarcerated. Upon Mother's release from jail in April 2011, she requested another visit with S.P. It was scheduled for later that month, but Mother did not show up. Mother then requested additional visits, but Ms. Edgar stated that she had not been able to reach Mother to schedule any visits.

{¶20} Mother would also make telephone calls to S.P. at her placement. The agency had to eventually step in and limit the calls to early evenings because Mother would call after S.P. was asleep and become agitated and belligerent if she could not talk to her child. Later, telephone calls were suspended altogether because they were upsetting S.P. Mother would stay on the phone without talking, criticize the kinship providers, fall asleep, blare music, eat, or converse with other people rather than with S.P. The suspension has since been lifted.

{¶21} According to the caseworker, Mother and child love each other and show affection to each other. The quality of interaction at visits varied. Sometimes, they talked and interacted well, but other times, S.P. would play alone while Mother just watched. Ms. Edgar testified that sometimes S.P. was more of a parent than Mother. S.P. worried about Mother and felt that she needed to take care of her. This behavior was corroborated by the testimony of the guardian ad litem, who testified that S.P. worried about the well-being of Mother.

{¶22} The caseworker testified that S.P. exhibited some hoarding behaviors shortly after her removal from the home. According to Ms. Edgar, hoarding usually occurs when one does not have enough food early in life and then hoards it when more food is available, due to a fear that the source will not continue. This, too, was corroborated by the testimony of the guardian ad litem who conveyed S.P.'s statement that there was not enough food in Mother's home. S.P. has been involved in counseling for such behavioral concerns while in temporary custody.

{¶23} There is no evidence of any bond or relationship between Father and S.P. The child knows his name and that he is her father, but has not seen him since she was two or three years old. At the time of the hearing, Father was incarcerated at Belmont Correctional Institution for failure to pay child support for S.P.

{¶24} At the same time, S.P. is doing very well in her placement with a maternal cousin and is bonded to that family. She has fit in well with the other children in the family and was doing well in school. The parents treat her "like she's one of theirs" and, while living with them, she is able to see many members of her extended family. The kinship caregivers are interested in adopting S.P. if permanent custody is granted.

{¶25} There are two other adult maternal relatives with whom S.P. has had some relationship. An aunt asked to see S.P. and inquired about legal custody, but never followed through. S.P. has a minimal relationship with her maternal grandfather, but there is negligible evidence regarding him or that relationship in the record.

{¶26} S.P. did not testify, but her wishes as to placement were conveyed through her legal counsel as well as her guardian ad litem. Early in the proceedings, an attorney was appointed to represent S.P. because her wishes appeared to be in conflict with the recommendation of the guardian ad litem. S.P. initially stated that she wanted to return to live with Mother. By the time of the permanent custody hearing, however, the attorney reported that the child's opinion was no longer in conflict with the recommendation of the guardian ad litem. The attorney reported that S.P. now wished to remain with the maternal cousin with whom she had been living. The attorney reported to the trial court that all of the child's basic needs were being met in that home. She was doing very well in school and did not want to return to a life where she was missing school and being teased because of clothes that did not fit or were not

clean. The attorney stated that S.P. was suitably mature to make such a decision. She reported that although S.P. loves Mother and misses her when she does not come to visits, S.P. wanted some sort of regular life and believes she can find that with the family with whom she was then living.

{¶27} The guardian ad litem similarly reported that S.P. loves Mother, and while she would like to be with her, she understands that it is not possible to live with her. The guardian ad litem believes S.P. understands that if permanent custody is granted she would be living with this family forever and, although she loves her mother, she is fine with that. According to the guardian ad litem, S.P. is very close to the other children in her current home and is very comfortable there. The guardian ad litem believes that Mother is not able to provide a stable home for S.P. Mother has serious mental health issues, has not been consistent with her medications, and has not had regular contact with S.P. The guardian ad litem believes that it is in the child's best interest to be placed in the permanent custody of CSB. She also expressed the belief that any harm to S.P. as a result of permanent custody being granted will not be significant.

{¶28} Mother and S.P. resided together for seven years with no reported problems. S.P. never resided with Father. S.P. came into the custody of CSB in July 2009. S.P. was placed with a foster family for three weeks, and was then moved to the kinship placement. She has been in that home for nearly two years.

{¶29} The caseworker stated that S.P. needs a home with people who can care for her, and she does not believe that Mother can do that at this time. According to Ms. Edgar, Mother has not successfully addressed her mental health issues such that she can provide S.P. with consistent and stable care. Father abandoned S.P. long ago, is currently incarcerated, and there is

no reason to conclude that he could or would be able to provide S.P. with a stable home. See R.C. 2151.414(E)(10). The caseworker believes that permanent custody is the only means to achieve a legally secure permanent placement for S.P. and is in the best interest of the child.

{¶30} Mother has argued that CSB did not make sufficient efforts to find relatives that might have assumed legal custody of S.P. The agency invited an aunt to pursue legal custody, but she did not follow through with the process. S.P. had a minimal relationship with a maternal grandfather, but there is no evidence to suggest that he could or would provide her with a permanent home. Father deserted his daughter years ago and did not respond to any letters or notices during this proceeding. There is no indication in the record that there are any paternal relatives with whom S.P. has had any sort of a relationship. No one filed a motion with the trial court seeking legal custody.

{¶31} CSB did, however, successfully place S.P. with a relative with whom S.P. appears to be satisfied and doing well. The caseworker explained that she discussed legal custody with the relative, but because of Mother's mental health issues and conflicts that occurred during the last two years, the relative preferred to pursue adoption instead. The relative has, however, expressed a willingness to allow S.P. to continue a relationship with Mother and other maternal relatives, provided the child's safety can be assured. Moreover, S.P. is almost ten years old and has stated that she wishes to remain with the family with whom she is currently placed. Upon this record, it is mere speculation to suggest that CSB could have secured a legal custody placement of S.P.

{¶32} The record demonstrates that there was clear and convincing evidence before the trial court from which it could conclude that permanent custody was in the child's best interest.

Consequently, the trial court did not err in terminating the parents' parental rights and in placing S.P. in the permanent custody of CSB. Mother's sole assignment of error is overruled.

III

{¶33} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

BELFANCE, P. J.
CARR, J.
CONCUR

APPEARANCES:

DEREK CEK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.